IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| TREESDALE, INC.; ) | |
| METALS PURIFYING COMPANY, INC., ) | |
| Plaintiffs ) | |
| ) | |
| vs. ) | Civil Action No. 08-701 |
| ) | Judge David Stewart Cercone/ |
| TIG INSURANCE COMPANY formerly ) | Chief Magistrate Judge Amy Reynolds Hay |
| known as INTERNATIONAL INSURANCE ) | |
| COMPANY; ) | |
| Defendant ) | |

**REPORT AND RECOMMENDATION**

I.   RECOMMENDATION

Treesdale, Inc. and Pittsburgh Metals Purifying Company, (collectively "Treesdale" or "the Plaintiffs"), have filed a Motion pursuant to Fed. R. Civ. P. 12(c), for Judgment on the Pleadings with respect to the Seventeenth Affirmative Defense asserted by Defendants TIG Insurance Co., formerly known as International Insurance Company ("International"). In that defense, International asserts that Treesdale's claims under two identically worded umbrella policies issued by International are barred by asbestos exclusions. In a Report and Recommendation dated October 12, 2009 (Doc. 60), the Court recommended that Treesdale's Motion (Doc. 35) be granted. The Defendants then filed a Motion for Reconsideration (Doc. 63) of that Recommendation pursuant to Rule 54(c). Because that Rule does not provide a means for challenging the legal or factual findings in a Report and Recommendation, the Court construes the Motion for Reconsideration as a filing of Objections pursuant to the Magistrates Act, 28 U.S.C. § 636(b)(1)(B) & (C), and Local Rule 72.D.2 , and views the Plaintiffs' opposition to that Motion as a response to the Objections. Having reviewed the arguments raised by the parties, the Court is persuaded to vacate its original Report and Recommendation, setting forth its revised Report and

Recommendation here. For the reasons explained herein, the Court respectfully recommends that the Plaintiffs' Motion for Judgment on the Pleadings (Doc. 35) be denied.

II.   REPORT

   A.   Background

In this diversity action, Treesdale seeks, in part, a declaration pursuant to 28 U.S.C. §2201 that two umbrella policies issued by International provide Treesdale with coverage for asbestos-related bodily injury claims. (Doc. 33 at 1). The Plaintiffs, former manufacturers, sellers, and distributors of asbestos-containing products used in molten steel operations, have been named as defendants in thousands of claims based on asbestos-related bodily injury. (Id. at 12).[1] These claims - and similar claims expected to be filed in the future - are based on injuries which occurred or were in process during years prior to the bankruptcy when Treesdale was covered by insurance policies issued by International. The policies at issue here are: (a) International Policy No. 512-496940-3, covering the period from July 1, 1988 to July 1, 1989; and (b) International Policy No. 523-541174-4, covering the period from July 1, 1989 to July 1, 1990) (collectively "the Policies"). (Id. at ¶ 16). Each policy provided excess liability and umbrella coverage above that available in primary policies issued by U.S. Fire Insurance Company ("USFIC").[2] Resolution of the Plaintiffs'

---

[1] As a result of these claims, the Plaintiffs are now debtors in Chapter 11 bankruptcy proceedings numbered 07-27576 and 07-27571 in the United States Bankruptcy Court for the Western District of Pennsylvania. (Doc 33 at ¶¶ 6,7).

[2] The Plaintiffs contend, and the Defendant does not dispute that "all available coverage issued for policy periods other than those covered by the Policies has either been exhausted and/or coverage has been denied by the relevant insurer." (Doc. 33 at ¶ 21). West Chester Fire Insurance Company and The North River Insurance Company, both of which are alleged to be affiliated with International, also issued policies insuring the Plaintiffs. Prior to initiation of the bankruptcy proceedings, these Companies defended some of the asbestos claims against Treesdale under a reservation of rights. They have since filed suit against Treesdale in this District at 2:05-cv-01523, seeking reformation of some policies to include an asbestos exclusion and a declaration that there is no coverage respect to others. Pre-trial statements have been filed, but the docket, as of the date of this Report, does not show that a trial date has been set.

Motion turns on the terms of these policies.

    B.    <u>Standard of Review</u>

A Rule 12(c) motion may be granted "where material facts are undisputed and where a judgment on the merits is possible merely by considering the contents of the pleadings." <u>Sellers v. M.C. Floor Crafters, Inc.</u>, 842 F.2d 639, 642 (2d Cir.1988) (citation omitted). Where, as here, a motion for judgment on the pleadings requires assessment of the merits, the Court uses the same standard as it would in considering a motion for summary judgment. <u>See e.g.</u>, <u>Alexander v. City of Chicago</u>, 994 F.2d 333, 336 (7th Cir. 1993); <u>Broadcom Corp. v. Agere Sys. Inc.</u>, Civ. Act. No. 04-2416, 2004 WL 2009320 at *1 n.3 (E.D. Pa. Sept. 8, 2004).[3] Thus, the Court cannot grant Treesdale's Motion for Judgment on the Pleadings unless it finds that Treesdale has clearly established that: (1) there are no material issues of fact; and (2) it is entitled to judgment as a matter of law. <u>DiCarlo v. St. Mary Hosp.</u>, 530 F.3d 255, 259 (3d Cir. 2008). In evaluating the evidence, the Court must consider all facts and their reasonable inferences in the light most favorable to the Defendant. <u>See</u> <u>Pennsylvania Coal Ass'n v. Babbitt</u>, 63 F.3d 231, 236 (3d Cir.1995).

    C.    <u>Discussion</u>

Treesdale contends that the Defendant's affirmative defense asserting denial of coverage

---

[3]The one significant difference between resolution of Rule 12(c) and Rule 56 motions is the fact that in deciding Rule 12(c) motions, the Court does not consider matters outside the pleadings. <u>Mele v. Fed. Reserve Bank of N.Y.</u>, 359 F.3d 251, 257 (3d Cir.2004). It may, however, take into account matters of public record, orders and exhibits attached to the complaint. <u>See</u> <u>In re Burlington Coat Factory Sec. Litig.</u>, 114 F.3d 1410, 1426 (3d Cir.1997) (clarifying that court may take into account undisputedly authenticated documents integral to or explicitly relied upon in the complaint or attached as exhibits to the motion to dismiss) (citations omitted); <u>Oshiver v. Levin, Fishbein, Sedran & Berman</u>, 38 F.3d 1380, 1384 n. 2 (3d Cir.1994) (same); 5B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1357 (3d ed. 2004). Fed.R.Civ.P. 12(c) provides, however, that "[i]f, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56." In this case, the Court considers only the pleadings and the terms of the insurance policies attached thereto.

under Coverage B of the relevant policies fails as a matter of law in light of the " language of the relevant policies themselves." (Doc. 36 at 2). According to Treesdale, the protection provided by Coverage B was intended to be and is broader than that in the underlying policy or in Coverage A, in that it does not incorporate the asbestos exclusion applicable to all other coverage. International responds that Coverage B, "pursuant to its plain terms" does not cover asbestos claims in that it "is derivative of Coverage A." Id. According to the Defendant, the asbestos exclusion contained in the underlying USFIC policies "is incorporated through Coverage A into the entire International 'policy,' not just into Coverage A . . . Coverage B does not *un*incorporate the exclusion." Id. (emphasis added).

"Ordinarily in insurance coverage disputes an insured bears the initial burden to make a prima facie showing that a claim falls within the policy's grant of coverage, but if the insured meets that burden, the insurer then bears the burden of demonstrating that a policy exclusion excuses the insurer from providing coverage if the insurer contends that it does." State Farm Fire and Cas. Co. v. Mehlman, Nos. 08-2220, 08-2261, slip op. at 12-13 (3d Cir. Dec. 16, 2009) (citing Koppers Co. v. Aetna Cas. And Sur. Co., 98 F.3d 1440, 1446 (3d Cir. 1996).

The Court turns next to the parties' arguments, evaluating them in accordance with established principles of contract interpretation.

     1.    The Law Governing Interpretation of Insurance Contracts

"[A] policy of insurance is a contract, and the interpretation of a contract is a question of law." Wall Rose Mut. Ins. Co. v. Manross, 939 A.2d 958, 962 (Pa. Super. 2007) (citing Gen. Refractories Co. v. Ins. Co. of N. Am., 906 A.2d 610, 612 (Pa Super. 2006)). In Pennsylvania, "the paramount goal of contract interpretation is to determine the intent of the parties." Garden State Tanning, Inc. v. Mitchell Mfg. Group, Inc., 273 F.3d 332, 335 (3d Cir. 2001) (citing Meeting House Lane, Ltd. v. Melso, 628 A.2d 854, 857 (Pa. Super. 1993)). The strongest objective

manifestation of that intent is the wording of the agreement itself.  Rich Maid Kitchens, Inc. v. Pa. Lumbermens Mut. Ins. Co., 641 F. Supp. 297, 307 (E.D. Pa. 2006).  "Words of 'common usage' in an insurance policy are to be construed in their natural, plain, and ordinary sense . . . ."  Wall Rose Mut. Ins. Co., 939 A.2d at 962.  "If the terms of a policy are clear, this Court cannot rewrite it or give it a construction in conflict with the accepted and plain meaning of the language used."  Id.

"'Where the intention of the parties is clear, there is no need to resort to extrinsic aids or evidence.'"  Steuart v. McChesney, 444 A.2d 659, 661 (1982) (quoting E.Crossroads Ctr., Inc. v. Mellon-Stuart Co., 205 A.2d 865, 866 (1965)).  Instead, the meaning of a clear and unequivocal written contract "'must be determined by its contents alone.'"  Id.  "[W]here language is clear and unambiguous, the focus of interpretation is upon the terms of the agreement as manifestly expressed, rather than as, perhaps, silently intended."  Id.

Because the law of Pennsylvania presumes that the writing conveys the parties' intent,  a contract will be found ambiguous only if it is: (1) reasonably or fairly susceptible of different constructions; (2) capable of being understood in more than one sense; (3) obscure in meaning through indefiniteness of expression; or (4) its words have a double meaning.  See Bohler-Uddeholm Am., Inc. v. Ellwood Group, Inc., 247 F.3d 79, 93 (3d Cir. 2001).  A contract is not ambiguous if the court can determine its meaning absent a guide other than "knowledge of the simple facts on which, from the nature of the language in general, its meaning depends; and a contract is not rendered ambiguous by the mere fact that the parties do not agree on the proper construction."  Id.  "[A]mbiguity in a contract must emanate from the language used in the contract rather than from one party's subjective perception of its terms."  17A Am. Jur. 2d Contracts § 331 (2d ed. 2008).  In determining whether or not there is an ambiguity, "the *whole contract must be considered* and not an isolated part."  Gerhart v. Henry Disston & Sons, Inc., 290 F.2d 778, 784 (3d Cir.1961) (emphasis added).

"When a provision of a policy of insurance is ambiguous, the policy provision is to be construed in favor of the insured and against the insurer." Wall Rose Mut. Ins. Co., 939 A.2d at 963 (citing Prudential Prop. and Cas. Ins. Co. v. Sartno, 903 A.2d 1170, 1174 (Pa. 2006)). "The insurance company, being the one who selects the language in the contract, must be specific in its use. An exclusion from liability must be clear and exact and unambiguous in order to be given effect . . . Thus, if we find an exclusionary clause to be ambiguous, we construe it in favor of the insured. But if the language is not ambiguous, we must enforce the exclusion." Id. (internal citations omitted). "When an insurer relies on a policy exclusion as the basis for its denial of coverage and refusal to defend, the insurer has asserted an affirmative defense, and, accordingly, bears the burden of proving such a defense." Id. at 962 (citing Wilcha v. Nationwide Mut. Fire Ins. Co., 887 A.2d 1254,1258 (Pa Super. 2005). The Court finds that the Defendant has sustained that burden.

      2.     The Parties' Positions

Resolution of the Motion for Judgment on the Pleadings turns on provisions in the International umbrella policies denominated "Coverage A" and "Coverage B." Coverage A reads:

> We will pay those sums that the "insured" becomes legally obligated to pay as damages arising out of an "occurrence" which are in excess of the underlying insurance stated in Schedule A of this policy. The coverage provisions of the scheduled underlying policies are incorporated as a part of *this policy* except for (a) Medical Payment, (b) Uninsured or Underinsured Motorist Coverage, (c) any duty to investigate or defend any claim, or to pay for any investigation or defense, (d) the limits of insurance or (e) any other provision that is not consistent with a provision in this policy.
>
> This Insurance applies only to Bodily Injury, Personal Injury, Property Damage, or Advertising Liability which occurs during the policy period.

(Doc. 33 Ex. A, B) (emphasis added).

> Coverage B provides as follows:
>
> *With respect to any loss covered by the terms and conditions of this policy*, but not covered as warranted by the underlying policies listed on Schedule A, or any other underlying insurance, we will pay on your behalf for loss caused by an "occurrence" which is in excess of the "retained limit" for liability imposed on you by law or assumed by you under contract for Bodily Injury, Personal Injury, Property Damage, or Advertising Injury which occurs during the policy period.
>
> This Insurance applies only to Bodily Injury, Personal Injury, Property Damage, or Advertising Liability which occurs during the policy period.

(Id.) (Emphasis added).

The parties agree that the Plaintiffs do not have coverage for asbestos-related claims pursuant to the underlying USFIC policy or under Coverage A of the International umbrella policies. Their dispute, for purposes of the Plaintiffs' Motion, centers on whether the Defendant has any asbestos-related coverage obligation pursuant to Coverage B. Although the parties agree that the language of Coverage B is unambiguous, they do not agree on its meaning.

Treesdale frames its position as follows:

> Simply stated, Coverage A expressly applies where underlying coverage is applicable, and Coverage B expressly applies where underlying coverage is not applicable. The Umbrella Policies do not contain an asbestos exclusion and Coverage B does not incorporate any such exclusion. Therefore, Coverage B does not contain an asbestos exclusion that could bar Treesdale's claim for coverage of asbestos bodily injury claims.

(Doc. 36 at 9).   International, of course, disputes Treesdale's position, pointing first to the portion of Coverage A that reads: "The coverage provisions of the scheduled underling policies are incorporated as a part of this policy . . . ." (Doc. 33 Ex. A, B).  According to International, this language "means that [Coverage A of the umbrella policy] incorporates the Absolute Asbestos Exclusion from the U.S. Fire Primary Policies."  (Doc. 44 at 9).  This reading of the

7

umbrella policies, it says, is confirmed by the first sentence in Coverage B. That sentence " '- with respect to any loss covered by the terms and conditions of this policy -' ends the inquiry." (Id. at 10). "Coverage B is simply not implicated by the Underlying Claims, because Coverage A, by incorporating the asbestos exclusion into the [umbrella] 'policy', defines those claims as 'not covered' . . . ." (Id. at 11).

The parties agree that there is a distinction between the types of coverage provided in each of the two umbrella policy sections. "Coverage A is 'excess coverage' that incorporates the coverage provisions of the underlying policy and applies only when the underlying policy would also apply to a claim asserted against an insured." (Doc. 36 at 6). Coverage B, on the other hand, provides "broader ... liability insurance" which is "specifically designed to provide primary coverage for risks not covered by the underlying policy." See id. (emphasis in original). This distinction has been widely recognized in the case law.

   3.   Factors Underlying the Initial Report and Recommendation

The Court of Appeals for the First Circuit, writing in Commercial Union Ins. Co. v. Walbrook Ins. Co, LTD., 7 F.3d 1047 (1st Cir. 1993), explained that umbrella policies often provide both types of coverage set out in Coverage A and Coverage B. The Court noted that there is an important difference between their function and breadth: "[These coverages] are designed to fill gaps in coverage both vertically (by providing excess coverage) and horizontally (by providing primary coverage)." Id. at 1053. "Thus, the umbrella policy has two functions: 1) to provide for a higher limit for those losses typically covered by [underlying] liability insurance; [and] 2) to provide for some coverage of those less common losses not typically covered by liability insurance . . . ." Garmany v. Mission Ins. Co., 785 F.2d 941, 948 (11th Cir. 1986) (citing Ridgway v. Gulf Life Ins. Co., 578 F.2d 1026, 1030 (5th Cir. 1978). Issues relating to excess liability coverage turn solely on interpretation of the underlying policy. "[U]mbrella

liability adds a broadening measure of coverage against many of the gaps in and between the underlying coverages of the primary policy." Houbigant, Inc. v. Federal Ins. Co., 374 F.3d 192, 204 (3d Cir. 2004) (internal quotation marks omitted). See also 15 Couch on Insurance 3d §220.32 (2005) (instructing that umbrella coverage, in contrast to excess liability coverage "often provide[s] primary coverage for risks that the underlying policy does not cover.").

There is limited case law analyzing what are essentially the same policy provisions and arguments raised here. In Westview Assoc. v. Guar. Nat'l Ins. Co., 740 N.E.2d 220 (2000), the Court of Appeals of New York considered a case where the insured, the owner of an apartment building, brought an action for declaratory judgment that the insurer was obligated under the terms of an umbrella policy to defend and indemnify the insured in an underlying action involving ingestion of lead paint. The policy at issue contained two types of coverage - Coverage A and Coverage B. Coverage A provided excess coverage for damage exceeding the policy limits of the underlying polity, and contained the following language: "The coverage *provisions* of the scheduled '*Underlying Policies*' are incorporated as part of this policy." Id. at 221 (emphasis in original). The first sentence of Coverage B read, in part: "With respect to any loss covered by the terms and conditions of this policy, but not *covered as warranted by the 'Underlying Policies'* . . . ." Id. (emphasis in original). As is the case here, Coverage B did not contain an incorporation clause. In addition, the umbrella policy contained specific exclusions for certain types of injuries, but did not mention claims involving lead paint.[4]

The Court rejected the insurer's argument that the lead paint exclusion in the primary policy was incorporated into the entire umbrella policy by the language in Coverage A. It noted

---

[4] The umbrella policies issued by International devote more than a full page to similar specific exclusions, many of which mirror the exclusions set out in the underlying policies. See Doc. 35 Ex. A, B.

first that "[u]nlike Coverage A, Coverage B [did] not incorporate the exclusions contained in the underlying policy. . . Exclusions must be specific and cannot be extended by mere interpretation or implication." Id. at 222. The Court then wrote:

> Moreover, the umbrella policy contains specific exclusions for other types of injuries, including alcohol, asbestos and pollution claims, but not for lead paint. Those provisions would be completely unnecessary if, as defendant argues, all of the exclusions in the underlying policy are incorporated by reference into the entirety of the umbrella policy's coverage. Thus defendant's interpretation would render the umbrella policy's specific exclusions mere surplusage, a result to be avoided.

Id. Last, the Court found that the argument that Coverage B incorporated the exclusionary language of Coverage A failed to take into account the different purposes served by each section:

> Coverage A and Coverage B serve different purposes: Coverage A provides excess coverage, and Coverage B provides additional primary coverage for certain injuries not covered by the primary policy. Indeed, [to accept the insured's argument would] effectively negate[ ] Coverage B and leave[ ] the insured with only the excess coverage in Coverage A and no additional primary coverage.

Id. at 222-23. The District Court for the Eastern District of California reached a similar result - albeit via a truncated analysis, in Steadfast Ins. Co. v. Dobbas, No. Civ. S-05-0632, 2008 WL 324023 (E.D. Cal. February 5, 2008).

In the vacated Report and Recommendation, this Court agreed with the reasoning underlying the result in Westview,[5] finding that accepting International's argument would have a number of untoward consequences: (1) it would eradicate the distinction between Coverage A and Coverage B, rendering Coverage B superfluous; and (2) if the language of Coverage A automatically imports into the umbrella policy each of the exclusions set out in the underlying

---

[5]The parties have not cited, and the Court has not found a case in which a Pennsylvania court has addressed this issue.

policy, the entire section of the umbrella policy addressing specific exclusions would be reduced to surplusage. The Court, like the court in Westview, was unwilling to adopt a reading of the policy that failed to accord a reasonable meaning to each of its provisions. See Lumbermens Mut. Cas. Co. v. Sutch, 197 F.2d 79, 82 (3d Cir. Pa. 1952).

The Court's adoption of the reasoning in Westview was based in part on the Court's finding that the Defendant's discussion of the different purposes served by Coverages A and B was unhelpful. Although the Defendant articulated the relevant question: "Where does Coverage B fit in," its response was unsatisfactory: "The answer is, 'not here.'" (Doc. 44 at 10). Its statement that Coverage B "only comes into play where a claim is covered by the umbrella policy, but not the primary" was similarly unenlightening. International failed to suggest when or under what circumstances this could happen, stating only that such a "situation . . . is not presented here." Id. at 11. The Court also found it significant that the Defendant failed to address the purpose of the detailed specific exclusions set out in the umbrella policies, particularly against the background of the decision in Westview.

In its brief supporting the pending Motion for Reconsideration, the Defendant stops the gaps in its prior filing. The Court has carefully considered the arguments for and against granting International's Motion to Reconsider. Although it does not do so lightly, the Court concludes that allowing the initial Report and Recommendation to stand would work an injustice.

    4.  Factors Supporting the Court's Amended Recommendation

As the Court has already discussed, it was troubled by certain facets of the Defendant's original analysis. First, it was not clear what could ever be covered under Coverage B if all of the exclusions set out in the underlying policies applied to Coverage A *and* Coverage B. This was essentially the difficulty noted by the court in Westview.

In its Objections to the original Report and Recommendation, International resolves that

conundrum as follows:

> [B]ecause companies buy a single umbrella policy to provide excess insurance, as the Plaintiffs did here, the umbrella policy form must be adaptable to and usable with different types of underlying insurance.
>
> * * * *
>
> An umbrella policy . . . can provide coverage that is not provided by the underlying insurance. Through the policy coverage form and/or through endorsements, an umbrella policy can contain provisions that may add a coverage type that is not provided by an underlying insurance policy, or that may add other insureds or entities, or that may provide that certain limitations in the primary policies do not exist in the umbrella. For example, the umbrella might insure an entity that is not an insured on the primary policy, or it might contain an endorsement providing a type of coverage that is not included in the primary policies, or it might insure certain operations or locations or business units of the insured that are not included in the primary policies. In these cases, the umbrella policy would provide coverage that the primary insurance did not provide.

(Doc. 64 at 5) (footnote added) (citing Scott M. Seaman and Charlene Kittredge, Excess Liability Insurance: Law and Litigation, 32 Tort & Ins. L. J. 653 (1997)).  Thus, although Coverage B, which is part of a standard form, does not provide additional primary coverage to asbestos claims made against these Plaintiffs, it could, theoretically have application when that standard form is used in other circumstances involving underlying policies.

The second factor influencing the Court in framing its initial Report and Recommendation was International's failure to address the presence of specific exclusions in the umbrella policies. Given its argument that each of the exclusions contained in the underlying policies was incorporated into both Coverage A and Coverage B of the umbrella policies, the separate specific exclusions in the umbrella policies seemed superfluous. This was, in fact, the primary ground for the decision reached by the Court of Appeals of New York in Westview, 740 N.E.2d at 222, (specific exclusions in umbrella policies would be surplusage if all exclusions in the underlying

policy were incorporated by reference into the entirety of the umbrella policy's coverage). The Defendant now explains - with footnotes added by the Court - its contention that the result in Westview and this Court's reliance upon the reasoning in that case were misplaced:

> The "detailed specific exclusions" contained in the policy are present in the event that one or more of the policies underlying the umbrella policy do [sic] not contain one or more of the exclusions. This can happen if the umbrella policy is written over a "manuscript" primary policy,[6] or over a policy that does not contain the exclusions contained in the umbrella, or even if the umbrella policy is written to apply excess to a self-insured retention[7] and there is no or only a limited form of primary policy in place. In addition, many times the umbrella policy is written to apply excess to underlying insurance issued by a different insurance company, which may use different forms or terms; the umbrella exclusions compensate for this . . . .

(Doc. 64 at 9). The Court finds this explanation persuasive.

Finally, the Court is convinced that its original Report and Recommendation failed to take into account the term "this policy" as it is used in both Coverage A and Coverage B. These Coverages cannot reasonably be construed as separate policies. Indeed, the term "this policy" unmistakably refers to the umbrella policy form as a whole.

III.    Conclusion

Because the Court is convinced that the language of the umbrella policies is unambiguous, obviating the need to consider extrinsic evidence, and that the analysis set forth above best accords

---

[6] Manuscript policies do not provide "boilerplate" coverage, but are negotiated between the parties as to each item. See Am. Motorists Ins. Co. v. Gen. Host Corp., 667 F. Supp. 1423, 1425 (D. Kan. 1987). See also Port Auth. of New York and New Jersey v. Affiliated FM Ins. Co., 311 F.3d 226, 231 (3d Cir.2002) (finding that manuscript policies are the result of negotiation between knowledgeable parties).

[7] Black's Law Dictionary 1391 (8th ed.2004) defines "self-insured retention" as "[t]he amount of an otherwise-covered loss that is not covered by an insurance policy and that usually must be paid before the insurer will pay benefits" "A majority of jurisdictions . . . view . . . self-insurance as 'not insurance' in, inter alia, an 'other insurance' context." Con. Edison Co. of N.Y., Inc. v. Liberty Mut. 749 N.Y.S.2d 402, 404 (N.Y. Sup .Ct.2002) (collecting cases).

meaning to each of the policies' terms and to the policies as a whole, the Court recommends that the Plaintiffs' Motion for Partial Judgment on the Pleadings (Doc. 35) be denied.

In accordance with the Magistrates Act, 28 U.S.C. § 636(b)(1)(B) & (C), and Local Rule 72.D.2, the parties may file written objections in accordance with the schedule established in the docket entry reflecting the filing of this Report and Recommendation. A response to objections may be filed in accordance with Local Civil Rule 72.D.2

Respectfully submitted,

/s/ *Amy Reynolds Hay*
Chief United States Magistrate Judge

Dated: 21 December, 2009

cc:   Counsel of record via CM-ECF